Sonja KUZNICK, Petitioner

v.

DEPARTMENT OF PUBLIC
WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 13, 2010.
Decided Sept. 9, 2010.

Elissa D. Dorfsman, Morrisville, for petitioner.

Anthony L. Marone, Asst. Counsel, Philadelphia and Allen C. Warshaw, Chief Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge BROBSON.

Petitioner Sonja Kuznick (Kuznick) petitions for review of an order of the Department of Public Welfare (Department), Bureau of Hearings and Appeals (Bureau). The Chief Administrative Law Judge of the Bureau affirmed the decision of an Administrative Law Judge (ALJ) that denied Kuznick's appeal from a decision by the Bucks County Assistance Office (CAO). The CAO concluded that Kuznick is not eligible to retain part of her institutionalized [1] husband's monthly income because her own income is sufficient to enable her to live in the community without being impoverished. We affirm the Department's order.

The facts, as revealed in the ALJ's decision and the record, can be summarized as follows. Kuznick's husband resides in Buckingham Valley Nursing Facility. Mr. Kuznick applied to the CAO for Medical Assistance and Long Term Care (LTC)

benefits. The CAO notified Mr. Kuznick on July 9, 2009, that it had approved his application with an effective date of February 25, 2009.[2] In making its determination regarding Mr. Kuznick's eligibility, the CAO (1) calculated the monthly amount Mr. Kuznick would be required to contribute to his nursing care costs based upon his monthly income, and (2) calculated the amount of monthly income Kuznick, as a community spouse (CS),[3] would need to live in the community in a non-impoverished manner. This latter calculation is known as a CS's minimum monthly maintenance need allowance (MMMNA).[4] If a CS's MMMNA is insufficient to prevent impoverishment, the CS is entitled to a modification of her institutionalized spouse's monthly contribution for long-term care, such that his contribution is reduced and the CS essentially retains a portion of the institutionalized spouse's monthly income, thereby increasing her MMMNA.

---

1. An institutionalized spouse is an individual who "is in a medical institution or nursing facility ... and ... is married to a spouse who is not likely to meet the requirements" of a person in a medical institution or nursing facility for at least 30 consecutive days. 42 U.S.C. § 1396r–5(h)(1)(A) and (B). In other words, generally an institutionalized spouse is one who has a spouse who has not also been institutionalized.

2. County assistance offices use Commonwealth-generated form PA/MA LTC-x 162 to notify applicants of a decision. The form includes a section that evaluates an individual's monthly income. If income, minus deductions, is below a certain amount, the officer will deem an individual eligible for benefits. The form also provides a calculation method to determine the amount an individual must contribute toward his LTC costs. In the case of Kuznick's husband, the "162 Form" indicates that his income from social security and a pension total $1,921.37. From this amount the CAO deducted $45.00 per month for his personal needs allowance and $424.70 per month for

medical expenses, with the result being that Mr. Kuznick had available monthly income of $1,451.67. (Certified Record (C.R.) 24.)

3. The term "community spouse" is used to refer to the spouse of an institutionalized person. 42 U.S.C. § 1396r–5(h)(2).

4. Federal law and Pennsylvania regulations direct the manner in which a CAO must determine a CS's MMMNA. Essentially, the formula provides for an amount one and one-half times the official poverty line income level for two people plus the "excess shelter allowance" (which is based on the CS's monthly expenses for mortgage, insurance, and a standard utility allowance), minus the CS's individual monthly income. 42 U.S.C. §§ 1396r–5(d)(3)(A) and (B)(iii), and 55 Pa. Code § 181.452(d)(2)(i). This formula appears to reflect a legislative judgment that a CS should have a basic monthly income to cover housing and the costs associated with housing, with an additional amount to ensure that the CS can afford other necessities of life, such as food and clothing.

The CAO determined that Kuznick's MMMNA was $3,289.93. The CAO, using the above-noted regulatory formula, arrived at this figure by adding together Kuznick's excess monthly shelter allowance of $1,467.93 to the federally-established minimum monthly maintenance needs allowance of $1,822.00. The CAO concluded that because Kuznick's gross monthly income, which it determined to be $5,600.12, exceeded her MMMNA, she was not entitled to an increase in her MMMNA and corresponding reduction of Mr. Kuznick's monthly contribution for his nursing facility care.

Kuznick challenged this determination and the Bureau assigned the matter to an ALJ, who conducted a telephonic hearing on September 15, 2009. During that hearing, an Income Maintenance Caseworker (IMCW), Pamela Moteles, presented evidence that Kuznick's gross monthly income is $5,600.12, which reflects a gross monthly salary of $3,313.60, gross monthly social security payments of $1,802, a gross monthly pension of $340.74, and monthly interest income calculated to be $143.78. The IMCW explained that she examines a CS's total shelter costs, including rent or mortgage, insurance, taxes and a utility standard. The IMCW acknowledged that the utility standard may or may not bear any relationship to actual utility expenses. In Kuznick's case, the IMCW used the highest utility standard allowance of $491 per month. Kuznick's counsel offered "testimony" on behalf of Kuznick and also submitted to the ALJ documents, consisting mainly of credit card, mortgage, utility, pharmaceutical, and medical bills.

The ALJ determined that Kuznick's gross monthly income is $5,612.00 and that this income exceeded the MMMNA calculated by the CAO. The ALJ concluded that the CAO had fully complied with the regulatory directions for arriving at Kuznick's MMMNA and determining whether Kuznick is entitled to an increase in her MMMNA. The ALJ acknowledged that the purpose of the law is to prevent the impoverishment of a CS and that a county assistance office may increase a CS's MMMNA to prevent such impoverishment if "exceptional circumstances" warrant an increase. *Davis v. Dep't of Pub. Welfare,* 776 A.2d 1026 (Pa.Cmwlth.2001). Nevertheless, the ALJ concluded that the expenses and bills upon which Kuznick relied did not support her assertions that exceptional circumstances exist with regard to her income.

Kuznick petitioned for review of the ALJ's order.[5] Kuznick does not contend that the CAO erred in its calculations. Rather, she contends that the ALJ erred as a matter of law in her application of this Court's holding in *Davis.* Kuznick suggests that the ALJ in this case erred by (1) addressing Kuznick's expenses individually, rather than in the aggregate, and (2) characterizing the services or commodities identified in the bills as reflecting lifestyle amenities instead of obligations that could be a precursor to impoverishment.[6]

5. As an appeal from a Commonwealth agency, our standard of review in this matter is limited by the Administrative Agency Law to considering whether the ALJ erred as a matter of law, violated the petitioner's constitutional rights, or based her decision on factual findings that are not supported by substantial evidence. 2 Pa.C.S. § 704.

6. We granted Kuznick's unopposed motion to file a late reply brief. The Department then filed an application for relief, requesting that we strike and/or suppress Kuznick's reply brief for failure to conform to the requirements of Pa. R.A.P. 2113(a) and Pa. R.A.P. 2101. We agree with the Department that Kuznick's reply brief violates these rules on a number of grounds. For example, the brief refers to and attaches documents that are not part of the record. Kuznick thus addresses factual matters that she did not raise before

■ In *Davis*, a CS challenged a denial by a Department hearing officer of the CS's request for an increase in her MMMNA. Based upon an increase in the CS's pension benefits, the Department proposed to decrease her MMMNA. The CS, however, had also experienced an increase in the cost of her health care insurance. At the hearing, the CS produced documents reflecting an unreimbursed medical bill for $5,000 and other medical and dental expenses totaling approximately $23,000. The payment arrangement the CS had arrived at with the medical provider for the $5,000 bill required the CS to make monthly payments of $400. The hearing officer concluded that those expenses were not exceptional because such obligations were not out of the ordinary. Before addressing the merits of the case, this Court summarized the purposes behind the MMMNA rules:

> Prior to 1988, Medicare eligibility rules in this country frequently pauperized married couples by requiring them to virtually deplete their joint assets to allow one to qualify for coverage while the other remained in the "community." To prevent community spousal impoverishment, while ensuring that no one avoided contributing their fair share toward medical care, Congress amended the Social Security Act by enacting the Medicare Catastrophe Coverage Act of 1988, 42 U.S.C. § 1396r–5, *as amended*, (MCCA), allowing income for the community spouse above the poverty level. Under the MCCA, the community spouse receives, in addition to an allotted share of the couple's resources (the "protected share"), a minimum monthly maintenance needs allowance, or MMMNA, without rendering the institu-

tionalized spouse ineligible for Medicare assistance. *See* 42 U.S.C. § 1396r–5(d); 55 Pa.Code § 181.452(d)(2).

> When the community spouse feels that the amount is inadequate, or encounters exceptional circumstances, the community spouse may request a hearing to seek revision of that allowance.

*Id.* at 1028 (footnote omitted).

The Court's opinion quoted the regulation containing the expression "exceptional circumstances," 55 Pa.Code § 181.452(d)(2)(ix), as follows:

> The community spouse maintenance need allowance may exceed the amount determined in subparagraph (ii) [standard monthly allowance] and the amount specified in subparagraph (iv) [statutory maximum] if a greater amount is determined as a result of a Department hearing decision in which either spouse *establishes that the community spouse needs income above the standard due to exceptional circumstances resulting in significant financial duress.* The CAO shall review the increased income need established by the Departmental hearing decision at each application/reapplication whenever a change in the circumstances that warranted the increase no longer exist.

*Id.* at 1028–29 (substituted text in original; emphasis added).

This Court in *Davis* concluded that the hearing officer's approach was erroneous because the "hearing officer ... mistakenly understood his task to be determining whether an expense was 'exceptional' or 'ordinary;' that is, he required that the nature of the expense itself be exceptional, rather than determining whether or not the expense involved presented exceptional

the ALJ. Further, the brief includes non-legal argument essentially recharacterizing the evidence in the record. For these reasons alone,

we will grant the Department's application for relief and strike Kuznick's reply brief.

demands on the resources of this particular community spouse. We think this is contrary to the letter and spirit of the statute." *Id.* at 1029. We stated that the regulatory standard required only a showing that "the circumstances and the necessity of the expenses be exceptional." *Id.* at 1030. The Court then stated that "[w]e contend that the opportunity to increase the MMMNA here is not to 'guarantee the amenities of any current lifestyle' but rather to prevent the impoverishment of a community spouse." *Id.*

The Court reasoned that if the CS in *Davis* could "demonstrate the *legitimacy* of her unreimbursed medical expenses, and thereby demonstrate that her MMMNA should be increased on the basis of 'exceptional circumstances resulting in significant financial duress,' such an increase would be in furtherance, and not in derogation, of our Pennsylvania statute and the MCCA." *Id.* (emphasis added). In the end, the Court examined the specific financial detriment that the CS was experiencing because of the costs related to her legitimate unreimbursed medical expenses (which represented 80% of the CS's disposable income) and remanded the case to the Department for reconsideration of the question of whether the CS's unreimbursed *medical* expenses resulted in exceptional circumstances resulting in significant financial duress.

In addressing Kuznick's claims, we note that although this Court has not previously explored the question of what burden of proof a CS has in such a proceeding, the above-quoted regulation clearly places the burden on a CS to prove the existence of exceptional circumstances causing financial duress. 55 Pa.Code § 181.452(d)(2)(ix). We believe that Kuznick failed to satisfy her burden in this regard.

In support of her position, Kuznick asserts that for the first eight months of 2009 she had "normal" expenses of $46,710 and her net income for that period was $48,619. This mathematical calculation, she contends, demonstrates that she would have only $1,909 remaining for expenses for the last four months of that year. Kuznick also makes several non-record factual assertions. She contends that she is being dunned by credit card agencies and that she cannot pay the minimum payments on her credit cards.

Kuznick submitted evidence in the form of bills for services and goods she obtained during the first eight months of 2009. Kuznick also submitted a document summarizing her various costs for that period, itemizing by category the costs she has incurred for shelter expenses and other items, in an effort to satisfy her burden to show that her income was insufficient to prevent her from becoming impoverished.

The ALJ did not make specific factual findings regarding these individual costs. Despite the absence of specific factual findings regarding Kuznick's actual costs as compared to her income, we believe that the ALJ did not err in reaching her ultimate conclusion that Kuznick failed to establish the existence of exceptional circumstances resulting in financial duress. Although this Court may not make its own factual findings [7] and may not reweigh the evidence,[8] we believe that a review of the evidence indicates that Kuznick failed to carry her burden of proof as to the existence of exceptional circumstances.

---

**7.** This Court is bound by a fact finder's factual determinations as long as those facts are supported by substantial evidence. *Sturni v. Unemployment Comp. Bd. of Rev.*, 155 Pa. Cmwlth. 501, 625 A.2d 727, 729 (1993).

**8.** *Bethea–Tumani v. Bureau of Professional and Occupational Affairs*, 993 A.2d 921, 932 (Pa.Cmwlth.2010).

Even a cursory review of her various costs for housing, transportation, utilities, repairs, medications, and visits to physicians, indicates that those costs, broken down over a monthly period, leave Kuznick with a sufficient amount of income to prevent her from becoming impoverished. We would reach this result even using her *net* income as compared to her *gross* income, the latter of which is the method the regulations direct CAOs to use in determining spousal income and need. We further note that the law and regulations do not even include many of the items Kuznick submits for the purpose of determining a CS's MMMNA.

For ease of explanation we have incorporated below the data Kuznick offers in Exhibit A–1, approximating her monthly expenses based upon that information:

Monthly Income:

|  | Net | Gross[9] |
|---|---|---|
| *Salary* | 2219.00 | 3113.00 |
| *Social Security* | 1531.00 | 1802.00 |
| *Pension* | 300.00 | 340.00 |
| **Total**[10] | 4050.00 | 5255.00 |

Monthly Costs:

| | |
|---|---|
| *Mortgage* | 935.00 |
| *Electric* | 140.00 |
| *Sewer* | 30.00 |
| *Water* | 15.00 |
| *Lawn/Snow* | 23.50 |
| *Repairs* | 17.00 |
| *Car Lease* | 337.00 |
| *Phone* | 35.00 |
| *Internet* | 41.00 |
| *Insurance* | 115.00 |
| *Medications* | 65.00 |
| *Medical Bills* | 150.00 [11] |
| *Husband's Med.* | 112.00 |
| **Total** | 2015.00 |

Kuznick also included in Exhibit A–1 a summary of other costs, including credit card bills. The figure Kuznick indicated on her summary sheet as her total bill through August 2009 for her Disney "affinity"[12] credit card is $10,933.91. As the Department points out, the supporting bills Kuznick has supplied indicate that for the eight-month period from January 2009 through August 2009, her total charges on this credit card actually total only $6,615.30. Those charges included items such as a $3,000 payment to Honda, a Disney Resort charge of approximately $2,000, and three airline tickets totaling approximately $540.00.[13] Kuznick also includes in her expense category a total of $2,440.00 for a Nordstrom affinity credit card. Although Kuznick may be correct in asserting that the charges to her Nordstrom credit card reflect *legitimate* expenses, the credit card statements do not reveal the items or services for which she

9. There appears to be a discrepancy between the gross salary amount Kuznick lists and the gross used by the CAO. We will use Kuznick's figure here for the purpose of demonstration only, and note, however, that Kuznick acknowledges that she does not challenge the CAO's or ALJ's calculations as to her gross income. To arrive at the monthly net and gross figures above, we divided by 12 months the yearly gross and net figures Kuznick provided.

10. Kuznick does not include in her summary any interest income she receives. We note again that for demonstration purposes we have excluded the interest income the CAO and ALJ included in their determinations of Kuznick's income, but that Kuznick has no objection to the CAO or ALJ's calculations.

11. This does not include the amount of $3,125.00 Kuznick includes in her summary which, according to the actual bill for periodontal expenses covered a period from January *2006* through March 2009, and, thus, does not indicate what part of that total amount is attributable to the first three months of 2009.

12. An "affinity" credit card is one that is identified with two brands: a credit card issuer, such as VISA, and a company or brand name, such as Disney.

13. In light of that evidence we view Kuznick's assertion that she has not used her income for non-essential activity, such as trips, somewhat skeptically.

used this credit card. Kuznick's summary also refers to a total charge of $3,811.00 on an AT & T affinity credit card. Kuznick does not include any information as to the purpose of these charges.[14] Kuznick also includes charges for the period from several other retailers, including Macy's, Talbots, Loft, and Boscov's.

Given the fact that the monthly costs associated with Kuznick's non-lifestyle-related expenses are well below even her *net* monthly income, we cannot discern any error with the ALJ's reasoning that this Court's analysis in *Davis* does not apply. The credit card charges to which she refers appear generally (1) to represent either duplicative expenses already reflected in the specific expenses indicated above, (2) do not reflect any particular expenses, or (3) relate to Kuznick's acquisition of personal items.[15] In any event, the numbers, as indicated above, clearly show that Kuznick has ample income over and above the expenses of her listed necessities such that we cannot agree with her claim that she is entitled to an increase in her MMMNA because of exceptional circumstances causing her financial duress.[16]

Although this Court in *Davis* instructs us that a CAO should not base a decision to deny an increase in a CS's MMMNA solely on the nature of an individual expense, we cannot agree with Kuznick that the Court in *Davis* intended that any and all types of expenses that may create financial duress will constitute exceptional circumstances. In *Davis*, the Court focused on the legitimate *medical* expenses that the CS had incurred and which clearly implicated her ability to maintain existence above the poverty line, not merely her lifestyle. The CS in that case had no control over the expenses that caused her financial duress—they were legitimate medical expenses. In this case, Kuznick has not substantiated her claim with clear evidence indicating that her monthly disposable income places her in jeopardy of living an impoverished existence. Even viewing her figures in the light most favorable to her position, we see no indication that she is in such a situation. Further, as

14. The Department asserts that these charges may reflect Kuznick's payments for auto insurance, which she included earlier and separately (duplicating the expense, perhaps) on her summary sheet. Although her car insurance payment documents show that she apparently used a "card" for payment, the truth of the Department's assertion is not clear on the record. In any event, we cannot reach such a determination as such an exercise is beyond our standard of review. We do observe, however, that, because those credit card bills do not indicate the purpose of the charge, we cannot discern any legal error in the ALJ's ultimate conclusions regarding Kuznick's expenses based on the existence of and nature of these credit card charges. If we were to regard credit card charges independently as a grounds for concluding that exceptional circumstances have caused financial duress, we would open the gates for community spouses to use credit cards for any purpose, including solely lifestyle choices, thus providing an incentive for community spouses to use credit cards with impunity knowing they could further lifestyle choices at potentially great loss to the Commonwealth, which would have to shoulder a greater contribution for the nursing facility costs of the institutionalized spouse.

15. Among the personal items listed on one of Kuznick's charges are Lancome beauty products. This is perhaps one of the instances upon which the ALJ relied in concluding that Kuznick's actual "necessity" relates to maintaining a certain lifestyle. Such an interest, however, does not constitute exceptional circumstances that have resulted in financial duress. *Davis*, 776 A.2d at 1028–29.

16. Keeping in mind our standard of review, we are bound by the ALJ's factual findings where they are supported by substantial evidence. As indicated above, the evidence Kuznick herself submitted supports the pertinent factual findings and ultimate conclusions of the ALJ.

indicated above, the majority of the credit card bills to which she directs our attention appear to either fail to indicate what expenses or services to which the charges were applied, or they appear to be duplicative of other expenses or for the acquisition of items that are related to lifestyle choices.

Based upon the figures reflected in the record, the Court must agree with the ALJ that Kuznick has not demonstrated that she is in financial duress, and even if she were, we could not conclude that she has established the type of exceptional circumstances that would warrant an increase in her MMMNA. Accordingly, we affirm the Department's order.

## ORDER

AND NOW, this 9th day of September, 2010, upon consideration of Respondent's application for relief, the application is GRANTED, and it is ordered that Petitioner's reply brief is stricken. The order of the Department of Public Welfare, Bureau of Hearings and Appeals, is AFFIRMED.